**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ADIDAS AG; | ) | |
| ADIDAS INTERNATIONAL | ) | |
| MARKETING B.V.; | ) | |
| ADIDAS AMERICA, INC.; and | ) | |
| RUNTASTIC GMBH. | ) | Case No. 2:22-cv-00198 |
| | ) | |
| Plaintiffs, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| NIKE, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs adidas AG, adidas International Marketing B.V., adidas America, Inc., and

runtastic GmbH (collectively "Plaintiff" or "adidas") allege as follows:

## NATURE OF ACTION

This is an action under the patent laws of the United States, 35 U.S.C. § 1, et seq., for

infringement by Defendant Nike, Inc. ("Defendant" or "Nike") of patents owned by adidas.

## THE PARTIES

1.      Plaintiff adidas AG is a corporation organized under the laws of the Federal

Republic of Germany, with its principal place of business at Adi-Dassler-Strasse 1, 91074

Herzogenaurach, Germany.

2.      Plaintiff adidas International Marketing B.V. is a corporation organized under the

laws of the Netherlands, with a principal place of business at Atlas Arena Offices, Africa

Building, Hoogoorddreef 9-A, 1101 BA Amsterdam Zuidoost, Netherlands.

3.　　　Plaintiff adidas America, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 5055 North Greeley Avenue, Portland, OR 97217-3524 USA.

4.　　　Plaintiff runtastic GmbH is a corporation organized under the laws of Austria, with a principal place of business at Pluskaufstraße 7, Business Center, 4061 Pasching bei Linz Austria.

5.　　　Upon information and belief, Nike is a corporation organized under the laws of the State of Oregon with a regular and established place of business at 8930 S Broadway Ave. Suite 292, Tyler, TX, 75703.

## JURISDICTION AND VENUE

6.　　　This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.　　　Nike does business in Texas and is assigned Texas Taxpayer Number 19305845414.

8.　　　Nike can be served in the state of Texas and Nike's registered agent in the state of Texas is located at 5444 Westheimer Road, Suite 1000, Houston, Texas 77056.

9.　　　Nike conducts substantial business in the State of Texas and in this District, including (1) committing at least a portion of the infringing acts alleged herein and (2) regularly transacting business, soliciting business, and deriving revenue from the sale of goods and services, including infringing goods and services, to individuals in the State of Texas and in this District. Thus, Nike has purposefully availed itself of the benefits of the State of Texas, and the

exercise of jurisdiction over Nike would not offend traditional notions of fair play and substantial justice.

10.     Nike has committed acts of infringement in this district and has regular and established places of business at least at 8930 S Broadway Ave. Suite 292, Tyler, TX, 75703 (the "Nike Store").

11.     The Nike Store can be identified from a search of Nike's website, Nike.com.  *See* https://www.nike.com/retail.



12.     Nike has further availed itself of this District by filing a Complaints asserting Patents against Plaintiff adidas America, Inc. in this District.  *See Nike, Inc. v. adidas America, Inc. et al.*, No. 9:06-cv-00043-RHC (E.D. Tex. Feb. 16, 2006).

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400.

<u>**BACKGROUND**</u>

14.     adidas is one of the largest makers of sporting goods and apparel in the world. adidas has long had a culture of innovation, research and development. In its efforts to innovate and change sports through technology, adidas has made continuous investments in sports science, sensor technology, wearables and digital communication platforms.

15.    adidas has long been a leader in mobile technology, including technology related to mobile fitness and mobile purchases. adidas was the first in the industry to comprehensively bring data analytics to athletes.

16.    In 1984 adidas introduced the world's first shoe with an integrated computer.  The adidas Micropacer originally released in 1984 to coincide with the Olympic games in Los Angeles. The adidas Micropacer introduced fitness tracking into the running space by way of an embedded microprocessor.



17.    Twenty years later, in 2004, adidas launched the world's first intelligent running shoe, the adidas 1, which sensed and adjusted the comfort of the shoe while the shoe was worn.



18.    In 2005 adidas and Polar introduced Project Fusion, the first fully integrated training system combining sensors in shoes and wearable devices.



19.    In March 2008 adidas launched its training platform branded as "miCoach" for use on mobile phones, which offered personal coaching services so athletes of all levels can get fitter, run faster and simply be better.



20.    In 2010 adidas launched the "miCoach Pacer" a small, lightweight device that delivered real-time audible coaching as a user exercises via headphones or combined with their own MP3 player, as well as the "miCoach Zone" an easy to read color-code LED display on a

wristband device that provided accurate, real-time information making it easy to train at the right intensity with the help of a heart rate monitor.



21.     In August 2010 adidas further integrated miCoach into a mobile application available on smartphones and including functionality allowing users to track workouts using GPS.

22.     In December 2011, adidas launched the miCoach Soccer mobile game and shoe sensor, and in February 2012 launched the miCoach Basketball mobile game and shoe sensor.

23.     In July of 2012, adidas launched the miCoach Elite system, which used an integrated RF transmitter, each sensor transmits a constant stream of data to a ruggedized base station that coaches can then access on the sidelines via an iPad dashboard, or through a secure web application after the match .



24.     Subsequently in 2014, adidas launched the first "Smartball" an intelligent and app-enabled soccer ball with integrated sensor technology for dead-ball kick training such as penalties, free kicks, shooting, corners, long passes or goal kicks.



25.     In 2015, adidas also acquired runtastic, one of the most diverse global players in the health and fitness application market and operated a multi-application strategy with over 20 apps covering a wide variety of endurance, health and fitness activities.

26.     adidas continues to make multiple mobile-based fitness applications available, including the adidas Training and adidas Running, which have been downloaded by millions of users.

27.     Similarly, in 2015, adidas launched the adidas Confirmed App.  The confirmed App enables users to reserve and purchase limited edition footwear.  The Confirmed App reimagined how products are purchased with its safe, anti-bot raffle system.

28.     Through its highly engaged and active user base, adidas has established solid revenue and earnings streams and high user satisfaction in marketing a variety of digitally enabled products.

29.     adidas's investments have been rewarded by the U.S. Patent and Trademark Office.  adidas is currently the assignee of over 800 U.S. Patents and Patent Applications. Among these are multiple patents that cover various digital applications including fitness tracking applications and applications to manage online purchases.

**THE ASSERTED PATENTS**

30.     adidas AG owns United States Patent No. 7,805,149 ("the '149 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the '149 patent. The '149 patent was duly and legally issued by the United States Patent and Trademark Office on September 28, 2010, is active, and is entitled "Location-aware fitness training device, methods, and program products that support real-time interactive communication and automated route generation." A true and correct copy of the '149 patent is attached hereto as Exhibit 1.

31.     adidas AG owns United States Patent No. 7,957,752 ("the '752 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the

'752 patent. The '752 patent was duly and legally issued by the United States Patent and Trademark Office on June 7, 2011, is active, and is entitled "Location-aware fitness training device, methods, and program products that support real-time interactive communication and automated route generation." A true and correct copy of the '752 patent is attached hereto as Exhibit 2.

32.     adidas AG owns United States Patent No. 7,480,512 ("the '512 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the '512 patent. The '512 patent was duly and legally issued by the United States Patent and Trademark Office on January 20, 2009, is active, and is entitled "Wireless device, program products and methods of using a wireless device to deliver services." A true and correct copy of the '512 patent is attached hereto as Exhibit 3.

33.     adidas AG owns United States Patent No. 8,814,755 ("the '755 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the '755 patent. The '755 patent was duly and legally issued by the United States Patent and Trademark Office on August 26, 2014, and is entitled "Performance information sharing systems and methods." A true and correct copy of the '755 patent is attached hereto as Exhibit 4.

34.     adidas AG owns United States Patent No. 8,241,184 ("the '184 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the '184 patent. The '184 patent was duly and legally issued by the United States Patent and Trademark Office on August 14, 2012, is active, and is entitled "Methods and computer program products for providing audio performance feedback to a user during an athletic activity." A true and correct copy of the '184 patent is attached hereto as Exhibit 5.

35.    adidas AG owns United States Patent No. 9,675,842 ("the '842 patent"), including the right to sue for past damages, and runtastic GmbH is the exclusive licensee of the '842 patent. The '842 patent was duly and legally issued by the United States Patent and Trademark Office on June 13, 2017, is active, and is entitled "Portable fitness monitoring methods." A true and correct copy of the '842 patent is attached hereto as Exhibit 6.

36.    adidas AG owns United States Patent No. 10,275,823 ("the '823 patent"), including the right to sue for past damages, and adidas America, Inc. is the exclusive licensee of the '823 patent. The '823 patent was duly and legally issued by the United States Patent and Trademark Office on April 30, 2019, is active, and is entitled "Systems and techniques for computer-enabled geo-targeted product reservation for secure and authenticated online reservations." A true and correct copy of the '823 patent is attached hereto as Exhibit 7.

37.    adidas International Marketing B.V. owns United States Patent No. 8,234,798 ("the '798 patent"), including the right to sue for past damages, and adidas AG is the exclusive licensee of the '798 patent. The '798 patent was duly and legally issued by the United States Patent and Trademark Office on August 7, 2012, is active, and is entitled "Intelligent Footwear Systems." A true and correct copy of the '798 patent is attached hereto as Exhibit 8.

38.    adidas International Marketing B.V. owns United States Patent No. 7,188,439 ("the '439 patent"), including the right to sue for past damages, and adidas AG is the exclusive licensee of the '439 patent. The '439 patent was duly and legally issued by the United States Patent and Trademark Office on March 13, 2007, is active, and is entitled "Intelligent Footwear Systems." A true and correct copy of the '439 patent is attached hereto as Exhibit 9.

39.    adidas AG is the assignee or exclusive licensee in the United States for each of the '149 patent, '752 patent, '512 patent, '755 patent, '184 patent, '842 patent, '823 patent, '798

patent, and '439 patent (collectively "the Patents-in-Suit"). adidas America, Inc. is the exclusive licensee and holds a right to exclude others from using and exploiting the innovations claimed in the '823 patent. runtastic GmbH is the exclusive licensee and holds a right to exclude others from using and exploiting the innovations claimed in the '149 patent, '752 patent, '512 patent, '755 patent, '184 patent, and '842 patent.

40. Each of the claims of the Patents-in-Suit is presumed to be valid, and none of the claims of the Patents-in-Suit is representative of that Patent's other claims or the claims of the other Patents-in-Suit.

41. The claims of the Patents-in-Suit are not directed to an abstract idea, and the claim limitations, individually and as an ordered combination, involve more than performance of well-understood, routine, and conventional activities previously known to the industry.

42. The claims of the Patents-in-Suit are not directed toward fundamental economic practices, methods of organizing human activities, an idea itself, or mathematical formulas.

43. The claims of the Patents-in-Suit are directed to a narrow area of application and thus do not pre-empt others from using other methods and systems.

44. The claims of the Patents-in-Suit recite more than generic computer functionality and recite steps that are not purely conventional.

45. The claims the Patents-in-Suit recite improvements over prior art and conventional systems and methods and represent meaningful limitations and/or inventive concepts. Further, in view of these specific improvements, the inventions of the asserted claims, when such claims are viewed as a whole and in ordered combination, were not routine, well-understood, conventional, generic, existing, commonly used, well-known, previously known, or typical as of the earliest priority date of each of the Patents-in-Suit.

46.     The '149 and '752 patents (the "Route Tracking Patents"), share the same specification, which describes innovative systems and methods for tracking the route of a fitness activity. The Route Tracking Patents all claim priority back to Provisional Application No. 60/440,519, which was filed on January 16, 2003.

47.     None of the claims of the Route Tracking Patents is representative of the other claims.

48.     The specification of the Route Tracking Patents describes innovations "to location-aware electronic devices, and in particular, to apparatus, methods, and program products facilitating the routing, scheduling, and real-time monitoring of outdoor activities." '149 patent at Col. 1:21-24.

49.     The specification of the Route Tracking Patents discusses the existence of Global Positioning System (GPS) technology (*Id*. at Col. 1:27) and identifies numerous deficiencies in the prior art. "While it is useful to leverage location-aware electronics to apprise an athlete of accurate performance information, the present invention recognizes that conventional portable GPS-enabled electronic devices suffer from a number of shortcomings, including the following: (1) Conventional portable GPS-enabled electronic devices do not support automated two-way data communication; (2) Conventional portable GPS-enabled devices do not permit a remote trainer or other user to easily monitor substantially real-time performance information of a human user (e.g., athlete) equipped with a portable GPS-enabled device or to communicate with the human user in real-time; (3) Conventional portable GPS-enabled devices do not have an associated user interface that permits a user to easily generate, select, and schedule routes to be traversed, for example, in the course of a human fitness activity; and (4) Conventional portable GPS-enabled devices do not have an associated user interface that permits a user to graphically

and intuitive view, annotate and share location-specific route, performance and environmental information." *Id*. at Col. 1:41-65.

50.     The specification of the Route Tracking Patents describes specific improvements to technology. "These and other shortcomings in the art are addressed and overcome by the present invention. In one embodiment, the present invention provides a portable fitness device including a global positioning system (GPS) receiver that receives GPS signals, a wireless wide-area network transmitter supporting communication over-the-air to a wireless communication network, and a processing unit coupled to the GPS receiver and the wireless wide-area network transmitter. The processing unit receives the time-stamped waypoints from the GPS receiver and determines athletic performance information and route information from the time-stamped waypoints. The processing unit further outputs at least one of the athletic performance information and the route information to the wireless communication network during a human fitness activity via the wireless wide-area network transmitter." *Id*. 1:64-2:11. "In other embodiment, the present invention includes a computer-based method supporting user route determination. According to the method, the computer, for example, a server computer system executing a route generation module, receives at least one route criterion including at least one of route length and route duration. In response to receipt of the at least one route criterion, the computer system automatically generates one or more routes satisfying the at least one route criterion for user selection, where each such route represents a physical path that may be traversed by a human during a fitness activity. The routes are thereafter presented to a user for selection. In response to user selection of at least one route, the computer transmits information regarding the route to a portable fitness device, for example, via a wireless wide area network." *Id*. at Col. 2:12-29.

51. Each of the deficiencies and improvements recited above demonstrates that the invention claimed in the Route Tracking Patents was not routine, conventional, or well-known in the art as of the priority date of the Route Tracking Patents.

52. The claims of the '149 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A mobile phone, comprising: a global positioning system (GPS) receiver, a wireless wide-area network transmitter capable of supporting communication to a wireless communication network; a processing unit coupled to said GPS receiver and said wireless wide-area network transmitter, wherein said processing unit is capable of receiving from said GPS receiver data describing waypoints within a route of a fitness activity, capable of determining athletic performance information associated with multiple of the way points, and capable of outputting at least some of the data describing the waypoints and at least some of the athletic performance to said wireless communication network via said wireless wide-area network transmitter, and a wireless wide-area network receiver, coupled to said processing unit, capable of receiving communication from said wireless communication network."

53. The claims of the '752 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A method comprising: a server receiving user input describing a route of an activity; serving a graphical representation of the route to a user device in association with a toolset including at least one of a set including an annotation tool, a rating tool, and a review tool; the server receiving route-related information including at least one of a set including a user annotation, a user rating and a user review of the route entered utilizing said toolset; storing the

route and the route-related information on the server; and the server permitting access to the route and the route related information by a plurality of users."

54.     The application leading to the '149 patent underwent a thorough examination. For example, on December 4, 2009 the Patent Examiner rejected the then pending claims as obvious over U.S. 2002/0102988 ("Myllymaki") in view of alleged "Applicant's Admitted Prior Art" and U.S. 2002/0049535 ("Rigo"). The applicant amended the claims on March 31, 2010, explaining why they were patentable. On June 7, 2010, the examiner issued a Notice of Allowance. *See* Exhibit 10. The examiner indicated that the reasons for allowance are stated in the applicant's remarks on pages 14-21 of the March 31, 2010 response. *See id.* at *5-6*.

55.     On August 12, 2015, the PTAB rejected Under Armour, Inc.'s petition for *inter partes* review in IPR2015-00695, denying institution because Under Armour did not have a reasonable likelihood of showing that any claims of the '149 patent were unpatentable. *See* Exhibit 11. This confirms that the improvement claimed in the Route Tracking Patents was not routine, conventional, or well-known in the art as of the priority date of the Route Tracking Patents.

56.     Further, the '149 patent was subject to *ex parte* reexamination in No. 90/020,094. On September 8, 2016, the Patent Office mailed a Notice of Intent to Issue Reexam Certificate confirming the patentability of all challenged claims. *See* Exhibit 12 This confirms that the improvement claimed in the Route Tracking Patents was not routine, conventional, or well-known in the art as of the priority date of the Route Tracking Patents.

57.     The application leading to the '752 patent underwent a thorough examination. For example, on June 3, 2010 the Patent Examiner rejected pending claims as anticipated by U.S. 2001/0027375 ("Machida"). On September 1, 2010, applicant submitted new claims, and argued

that the rejection over Machida was improper. On February 18, 2011, the examiner allowed the claims, stating that the reasons for allowance are stated in applicant's remarks on pages 6-9 of the September 1, 2010 response. *See* Exhibit 13.

58.     The specification of the '512 patent describes innovative systems and methods for creating a training plan of fitness activities. The '512 patent claims priority back to Provisional Application No. 60/440,519, which was filed on January 16, 2003 as well as Provisional Application No. 60/584,300, which was filed on June 30, 2004.

59.     None of the claims of the '512 patent are representative of the other claims.

60.     The specification of the Route Tracking Patents is incorporated by reference into the '512 patent, which is a continuation in part of the parent application of the Route Tracking Patents. Thus, each of the deficiencies and improvements in technology set forth in the Route Tracking Patents, discussed above, is also set forth in the '512 Patent.

61.     The '512 patent describes "[a] user interface is presented through which a training plan is established. The training plan includes a plurality of workouts each describing a human physical activity. The training plan is stored within data storage for selection by any of a plurality of users. In response to a user among said plurality of users selecting said training plan, data describing at least one workout in said training plan is electronically transmitted to a client device associated with the user." '512 patent at Col. 1:37-44.

62.     Each of the deficiencies and improvements recited above demonstrates that the improvement claimed in the '512 patent was not routine, conventional, or well-known in the art as of the priority date of the '512 patent.

63.     The claims of the '512 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known,

routine, or conventional: "A program product, comprising: a tangible computer-readable storage medium encoded with program code executable by a data processing system, wherein the program code includes: a training plan module that permits selection by any of a plurality of users of a training plan from among one or more training plans in a training plan database, wherein the training plan includes a plurality of workouts each describing a prospective human physical activity to be performed and said training plan includes a distance-based performance goal for at least one of said workouts, and wherein the training plan module, responsive to a user among said plurality of users selecting said training plan, electronically transmits data describing at least one workout in said training plan that is to be performed to a client device associated with the user, and wherein the training plan module automatically customizes at least one prospective workout of the training plan in response to one or more inputs indicating actual measured performance of the user in the human physical activity."

64.     Its parent application and the application leading to the '512 patent underwent thorough examination. For example, on November 16, 2007 the Patent Examiner rejected certain pending claims as allegedly anticipated by U.S. 2003/0091964 ("Yeager"), rejected others as allegedly obvious over Yeager in view of U.S. 2003/0224337 ("Shum"), and rejected others as allegedly obvious over Yeager in view of U.S. 2003/0107433 ("Mault"). On February 19, 2008 the applicant amended the claims and explained why they were patentable. On May 29, 2008, the examiner issued a final rejection. On September 5, 2008, the applicant amended the claims further, explaining why they are patentable. On September 30, 2008, the applicant amended the claims for a third time, explaining further why the claims are patentable. On October 10, 2008, the applicant again amended the claims, pursuant to a telephone interview with the examiner on September 30, 2008.  On October 10, 2008 the examiner allowed the claims. Exhibit 14. The

examiner explained that the prior art, including 7,298,327 ("Dupray"), U.S. Pat. No. 6,745,011 ("Handrickson"), U.S. Pat. No. 6,605,038 ("Teller"), U.S. Pat. No. 6,246,882 ("Lachance"), and U.S. 2003/0149526 ("Zhou"), "either combined or alone fails to teach automatically customizing at least one prospective workout of the training plan in response to one or more inputs indicating actual measured performance of the user in the human physical activity and wherein said training plan includes a distance-based performance goal for at least one of said workouts." *See id.* at 5-6. This confirms that the improvement claimed in the '512 patent was not routine, conventional, or well-known in the art as of the priority date of the '512 patent.

65.     The '755 patent describes innovative functionality related to fitness tracking and claims priority to Provisional Application No. 60/270,400, which was filed on February 20, 2001. None of the claims of the '755 patent is representative of the other claims.

66.     The specification of the '755 patent describes shortcomings of the prior art devices. "None of these individual devices can combine with any of the other devices to provide improved functions. If a user wishes to upgrade the capabilities of any of these devices, a new, expensive device must be purchased and the old device discarded." '755 patent at Col. 1:38-43.

67.     The specification of the '755 patent explains that "[w]hat is needed is a system in which individual portable device modules can be combined in a multitude of ways to provide an infinite variety of functions. A portable system is needed in which new functions can be added by simply adding or replacing a single component. A portable system is needed in which the functions can be modified simply by downloading new software or other parameters. A system is needed in which functions in different fields of use can be easily combined. And a system is needed in which the economies of scale and scope of building devices across multiple fields of use can be used to benefit users of devices in all of the fields of use." *Id*. at Col. 1:44-55.

68.     The specification of the '755 patent describes additional shortcomings of the prior art. "U.S. Pat. No. 6,047,301 (2000) and U.S. Pat. No. 6,336,126 (2002) both to Bjorklund, et al., disclose a wearable computer that communicates with a display device using an optical link, and with a local area network using a radio communications link. However, the system described is not modular, nor is it extensible." *Id*. at Col. 1:62-67.

69.     The specification of the '755 patent describes additional shortcomings of the prior art. "U.S. Pat. No. 6,324,053 (2001) to Kamijo discloses a wearable data processing system. However, this system depends on a network of wiring stitched into the clothing of the user." *Id*. at Col. 2:1-3.

70.     The specification of '755 patent describes additional shortcomings of other prior art systems explaining that they "do not anticipate the needed methods for downloading data to a personal area network from a personal computer or other system, nor for retrieving data from a personal area network to a personal computer or other system. And the wide variety of components, configurations, and uses has not been anticipated." *Id*. at Col. 2:30-36.

71.     The specification of the '755 patent describes additional shortcomings of the prior art. "Users need more flexibility in display devices, such as how they are worn so that they may be easily viewed during different activities. Users need display devices that can be easily modified in their position and orientation. Users need a variety of mounting options for individual components in an MPN. Users need an audio device that can be easily worn during various activities, that can be heard during activities with ambient noise, and that won't disturb other nearby people. Users need a system that provides multiple types of audio output in an intelligent fashion. Users need a variety of input devices for different types of activities, and which can be easily accessed during those activities." *Id*. at Col. 2:37-48.

72.     The specification of the '755 patent describes additional shortcomings of the prior art, explaining "[u]sers need a network that provides entertainment features, including playing music, playing games, and capturing audio and video. Users need a portable system that combines personal organization functions with other functions. Users need a mobile journal system that can be customized for different types of uses, such as travel, athletics, healthcare, or other purposes. Users need a system that provides guidance features, and combines them with other features, such as audio and video annotations, collection of personal data, and athletic workouts." *Id.* at 2:52-62. Further, "[u]sers need a system that can provide a variety of athletic functions, such as downloading workout control parameters as well as uploading results of a workout. Users need a system that can interface with exercise equipment, bicycles, and other personal equipment. They need a system that collects performance data, detects and corrects errors in the collected data, and estimates secondary data, based on the collected primary data. Athletes need a mobile system to measure cadence and stride length. Some athletes need reminders to consume water, sodium, and food. Swimmers need a system to measure and log lap-swimming workouts. Runners and other athletes need a mobile system to provide form feedback. Athletes need a system that can work with another system to provide a competition between multiple athletes." *Id.* at Col. 2:63-3:9.

73.     The specification of the '755 patent explains that its "invention satisfies these and other needs by providing a modular personal network (MPN). A main aspect of our invention is a system that allows multiple individual network components (INCs), each with one or more primary functions, to be used in a wireless personal network, and that INCs may be added and removed modularly to add or remove functions of the MPN. This includes the ability to add INCs that were not anticipated when the MPN was first assembled. INCs are personal, in that

they may be worn, carried, mounted on personal equipment, or otherwise used in proximity to the person associated with the MPN…. Another aspect is the ability to download software, data, settings, and other information into an INC to control functions of the MPN, and to upload data from an INC." *Id*. at Col. 3:35-50.

74.     The specification of the '755 patent describes additional specific improvements to technology: "Another aspect of our invention is that one of the INCs may function as a display device. A display INC may be mounted on the back of the wrist in a manner similar to a wristwatch, it may be worn on the side of the wrist or hand, or it may be worn in any other suitable location. The orientation of the display may be changed to suit the needs of the user. In another aspect of our invention, the display INC or other INCs may be worn using a reconfigurable mount that allows easy repositioning and replacement of the INC." *Id*. at Col. 3:66-4:7.

75.     Each of the deficiencies and improvements recited above demonstrates that the invention claimed in the '755 patent was not routine, conventional, or well-known in the art as of the priority date of the '755 patent.

76.      Claim 1 of the '755 patent recites at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A method for sharing information about a first individual who has engaged or is engaging in a first physical activity, the method comprising: determining first performance information for the first individual using a processor of a first portable performance monitoring system that is carried with the first individual during the first physical activity; wirelessly transmitting the first performance information from the first portable performance monitoring system; receiving the first performance information using a computing device that is

not carried with the first individual during the first physical activity; and generating a visual display based on the first performance information." '755 patent, Claim 1.

77.     Claim 17 of the '755 patent recites at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A method for a first individual using a portable performance monitoring system to engage in a physical activity competition, the method comprising: determining first performance information for the first individual using a processor during a first physical activity conducted by the first individual; receiving second performance information associated with a second individual from a remote computing device; determining comparative performance information using the processor based on the first performance information and the second performance information: and outputting the comparative performance information." '755 patent, Claim 17.

78.     Its parent applications and the application leading to the '755 patent underwent thorough examination. For example, the applicant submitted numerous references for the examiner's consideration, and on May 19, 2014, the Patent Examiner issued a Notice of Allowance. Exhibit 15. The examiner noted that the prior art fails to show or suggest the claimed invention. *See id*. at 6-7. This confirms that the improvement claimed in the '755 patent was not routine, conventional, or well-known in the art as of the priority date of the '755 patent.

79.     The '184 and '842 patents (the "Audio Feedback Patents") share a common specification, which describes innovative functionality related to portable fitness monitoring. The Audio Feedback Patents, through a string of continuation applications, all claim priority to Application No. 12/467,944, which was filed on May 18, 2009.

80. None of the claims of the Audio Feedback Patents is representative of the other claims.

81. The specification of the Audio Feedback Patents describes shortcomings of the prior art. "Sports trainers, as well as other exercise and fitness professionals are available to assist individuals in developing exercise programs appropriate for their individual fitness levels and their specific fitness or exercise goals. Hiring such professionals, however, can be expensive. Furthermore, the busy schedules of many individuals make it difficult for these individuals to set aside time to meet with an exercise and fitness professional on a routine basis. Thus, many individuals forego using the services of exercise and fitness professionals, and they never achieve the benefits that can be obtained from an exercise program tailored, for example, to one's fitness level." '184 patent at Col. 1:37-48.

82. The specification of the Audio Feedback Patents explains that "[w]hat is needed are new portable fitness monitoring systems, methods, and computer program products for providing improved audio performance feedback to a user during an athletic activity." '184 patent at Col. 1:52-55.

83. The specification of the Audio Feedback Patents describes specific improvements to technology. "Embodiments of the present invention relate to a method for providing audio performance feedback to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: the portable fitness monitoring device receiving one or more audio feedback files; the portable fitness monitoring device generating audio performance feedback during the athletic activity by reference to an index, wherein the index is associated with the one or more audio feedback files; and the portable fitness monitoring device providing

the audio performance feedback to the user during the athletic activity audibly through an audio output device." *Id*. at Col. 1:59-2:2.

84. The specification of the Audio Feedback Patents describes additional specific improvements to technology. "Embodiments of the present invention also relate to a computer program product comprising a non-transitory computer useable medium having computer program logic stored therein for causing one or more processors of a portable fitness monitoring device to provide audio performance feedback to a user during an athletic activity, the computer program logic comprising: first computer readable program code for causing the one or more processors to receive a first audio feedback file and a second audio feedback file; second computer readable program code for causing the one or more processors to generate an audio performance feedback phrase during the athletic activity by linking the first audio feedback file and the second audio feedback file; and third computer readable program code for causing the one or more processors to provide the audio performance feedback phrase to the user during the athletic activity audibly through an audio output device." *Id*. at Col. 2:3-20.

85. The specification of the Audio Feedback Patents describes additional specific improvements to technology. "Embodiments of the present invention further relate to a method for providing audible output to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: the portable fitness monitoring device receiving a workout routine, wherein the workout routine comprises a series of time-based intervals, wherein each interval has an intensity goal; the portable fitness monitoring device receiving an audio feedback file package; and the portable fitness monitoring device processing the workout routine and the audio feedback file package to provide audible output to the user through an audio output device during the athletic activity." *Id*. at Col. 2:21-32.

86. Each of the deficiencies and improvements recited above demonstrates that the invention claimed in the Audio Feedback Patents was not routine, conventional, or well-known in the art as of the priority date of the Route Tracking Patents.

87. The claims of the '184 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "[a] method for providing audible output to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: (a) the portable fitness monitoring device receiving a first audio feedback file and a second audio feedback file; (b) the portable fitness monitoring device generating an audio performance feedback phrase during the athletic activity by linking the first audio feedback file and the second audio feedback file by reference to an index; and (c) the portable fitness monitoring device providing the audio performance feedback phrase to the user during the athletic activity audibly through an audio output device." '184 patent at Claim 18.

88. The claims of the '842 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A method for providing audio feedback output to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: the portable fitness monitoring device selecting an audio feedback file package from a plurality of audio feedback file packages and processing the selected audio feedback file package to provide audible output to the user through an audio output device during the athletic activity, wherein the processing comprises generating an audio feedback phrase; and the portable fitness monitoring device receiving an indication of a user input during the athletic activity, wherein the portable

fitness monitoring device further provides the audible output to the user through the audio output device by processing the indication of the user input." '842 patent at Claim 15.

89.     Its parent applications and the application leading to the '184 patent underwent thorough examination. For example, on January 24, 2012 the examiner rejected claims over certain prior art. On April 18, 2012, the applicant responded and explained that the claims were patentable. The examiner agreed, and issued a notice of allowance on April 26, 2012. Exhibit 16. This confirms that the improvement claimed in the '184 patent was not routine, conventional, or well-known in the art as of the priority date of the '184 patent.

90.     Its parent applications and the application leading to the '842 patent underwent thorough examination. For example, on February 17, 2017 examiner Glenn Richman issued a notice of allowance, withdrawing certain earlier rejections over certain prior art. Exhibit 17. This confirms that the improvement claimed in the '842 patent was not routine, conventional, or well-known in the art as of the priority date of the '842 patent.

91.     The '823 patent (the "Product Launch Patent") describes innovative functionality related to secure online commerce. The Product Launch Patent claims priority to Provisional Application No. 62/180,022, which was filed on June 15, 2015.

92.     None of the claims of the Product Launch Patent is representative of the other claims.

93.     The specification of the Product Launch Patent describes shortcomings of the prior art. "Product manufacturers and retailers frequently announce and release upcoming products during limited release launch events. For popular and highly anticipated products, these limited release launch events draw long customer lines and cause frustration for potential customers who are unable to purchase the released product on launch day due to insufficient

supply and retail locations running out of inventory. Moreover, as retailers allow reservations for products to be made online and over the Internet, these retailers face technical hurdles unique to the online electronic reservation process. For example, for limited release product launches, online "spam bots" are computer programs that automatically generate electronic transmissions designed to mimic a real person. In the context of limited release and highly popular product launches, spam bots mimic online reservation requests, creating fraudulent reservations and reducing the number of available reservations for potential customers. There is a need for better online authentication measures during the online reservation process to combat the rise in spam bots and ensure that the ensuing reservation request is from a real person." '823 patent at Col. 1:15-35.

94. The specification of the Product Launch Patent describes additional shortcomings of the prior art. "Further, for large and popular retailers, millions of potential customers may be geographically dispersed. Occasionally, a retailer may have a product launch event limited to flagship store. With geographically limited product launches, there is a further need for retailers to be able to refine and control the online reservation process. Thus, another technical hurdle unique to the electronic reservation process used by retailers, particularly for retailers that have product launches limited to a flagship store, is in controlling and limiting the reservation requests so that only potential customers near the vicinity of the launch event will be able to complete the reservation." *Id.* at Col. 1:36-47.

95. The specification of the Product Launch Patent describes additional shortcomings of the prior art. "In addition, current processes for launching new products and making said products available to customers who have reserved the products rely on traditional methods of manufacturing and distribution. For example, retailers and manufacturers produce a limited set of

inventory via centralized manufacturing methods and distribute the limited inventory to the one or more retail locations that will be hosting the product launches. Retailers and manufacturers incur shipping and other overhead costs with the current system." *Id*. at Col. 1:48:56.

96.     The specification of the Product Launch Patent describes specific improvements to technology. "Systems and methods provided herein disclose a computer-enabled geo-targeted product reservation system that allows retail customers to reserve products at retail stores within a geo-targeted area and securely retrieve the reserved products. The product reservation system includes a customer mobile application that provides retail customers a secure mechanism for remotely reserving retail products without having to physically visit a retail location, presents instant confirmation of product availability in inventory at a nearby retail location, and allows retail customers to securely retrieve the product at the retail location without having to wait in long lines. In additional embodiments, upon securely reserving retail products via the mobile application, the product reservation system provides retail customers confirmation of products that are available via a real-time manufacturing process at a nearby retail location. For example, a retailer may introduce products that are manufactured in real-time (e.g., via addi[]tive manufacturing such as 3D-printing) during a product launch event." *Id*. at Col. 1:60-2:11.

97.     The specification of the Product Launch Patent describes additional specific improvements to technology. "The product reservation system includes a mobile application that receives and presents notifications of upcoming retail products. The mobile application may receive inputs from a retail customer for selecting one or more of the upcoming retail products for reservation. Upon selecting a retail product, an electronic transmission confirming the reservation (e.g., via an electronic message such as a short message service (SMS) text message, push notification, email message, or other message) is provided to the mobile application. To

confirm the authenticity of the reservation, the customer device receives inputs from the user to communicate a reply to the message. The mobile application further detects the location of the customer device and determines the closest retail location that has or will have the upcoming retail products in inventory. In some aspects, the mobile application may only allow reservation of the upcoming retail product if the customer device is located within a certain geographic region. In some embodiments, once the product is launched and in inventory, the mobile application displays, to the retail customer, a notification indicating that the product is available and information directing the customer to the geographic location of the retail location. In other embodiments, during a product launch event, the mobile application displays, to the retail customer, a notification identifying a nearby retail location that may manufacture the product via a real-time manufacturing process for the customer. The mobile application also displays on the customer device a unique identification code that identifies the retail customer and the reserved product. At the retail location, an agent of the retailer may use a companion mobile application to scan the unique identification code displayed by the customer device. The companion mobile application displays the reservation details, including the specific product reserved, on a user interface of the companion mobile application. Using the information provided on the companion mobile application, the retailer can retrieve the specific product for the customer." *Id.* at Col. 2:12-48.

98.     The claims of the Product Launch Patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "A computer-implemented method implemented in a customer device for ensuring customer authenticity of an electronic reservation for a product from a retailer by generating reservations only if threshold authentication conditions are

29

satisfied, the method comprising: receiving, at the customer device registered with a retailer server system, an electronic communication from the retailer server system remote from the customer device, the electronic communication providing a notification regarding launch of a product at a retail location and a time frame during which the product is available for reservation; during the time frame indicated in the electronic communication, receiving a first user input on a graphical user interface of the customer device, the first user input corresponding to a request for a reservation of the product and for selecting at least one custom feature of the product; receiving, at the customer device, a message requesting a response for authenticating a user operating the customer device; determining, at the customer device, an authenticity of the user operating the customer device, the authenticity of the user being determined based on a distance between a geographic location of the customer device and the retail location, and the determination of the authenticity of the user being performed to prevent a bot from reserving the product in advance of the launch; and transmitting, from the customer device to the retailer server system, a response to the message for authenticating the user of the customer device, the response received via a second user input, wherein the user being determined as authentic satisfies a first threshold authentication condition of one or more threshold authentication conditions, and wherein satisfaction of the one or more threshold authentication conditions causes the retailer server system to generate the reservation for the product according to the at least one custom feature selected by the first user input." '823 patent at Claim 1.

99.     The '823 patent underwent thorough examination. For example, the Examiner issued a notice of allowance on December 4, 2018, setting forth detailed reasons for allowance, including in view of 35 U.S.C. § 101. *See* Exhibit 18. This confirms that the improvement

claimed in the '823 patent was not routine, conventional, or well-known in the art as of the priority date of the '823 patent.

100.     The '798 patent describes innovative systems and methods for controlling articles of footwear. The '798 claims priority through other applications to Application No. 11/047,550, filed on January 31, 2005, which claims priority as a continuation-in-part of the application that led to the '439 patent,  Application No. 10/385,300, filed on March 10, 2003.  The '798 patent further claims priority to Provisional Application No. 60/557,902, filed March 30, 2004.  None of the claims of the '798 patent is representative of the other claims.

101.     The specification of the '798 patent describes drawbacks of prior art shoes, in particular that wearers must select different shoes for different purposes.  For example, "for activities requiring greater cushioning, such as running, the wearer must select one type of shoe and for activities requiring greater stiffness for support during lateral movement, such as basketball, the wearer must select a different type of shoe." '798 patent at Col. 1:35-39. Further, the specification of the '798 patent describes that prior shoes that may be adjustable, were only manually adjustable, thus "in order to adjust such shoes the wearer is required to interrupt the specific activity in which he/she is engaged. With some shoes, the wearer may also be required to partially disassemble the shoe, re-assemble the shoe, and even exchange shoe parts." *Id*. at Col. 1:56-60. Thus, the specification of the '798 patent describes that there is a need for a shoe that "adjusts a performance characteristic of the shoe to accommodate the bio-mechanical needs of the wearer." *Id*. at 2:21-23.

102.     The specification of the '798 patent describes an innovative solution to this problem in an "invention relate[d] to an article of footwear including an upper coupled to a sole and an intelligent system at least partially disposed in the sole. The system includes a control

system, a power source electrically coupled to the control system, an adjustable element, and a driver coupled to the adjustable element. The driver adjusts the adjustable element in response to a signal from the control system." *Id*. at Col. 2:54-61.

103.    The claims of the '798 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "An intelligent footwear system comprising: an article of footwear; a system for monitoring at least one parameter of the article of footwear, the monitoring system at least partially disposed in the article of footwear, wherein the monitoring system comprises: a sensor for sensing at least one value associated with the at least one parameter; and a transmitter for transmitting a signal corresponding to the sensed at least one value associated with the at least one parameter; and a device located remotely from the article of footwear and in communication with the monitoring system, the device configured to exchange data wirelessly with the monitoring system, wherein the device comprises: a processor for determining whether the sensed at least one value associated with the at least one parameter satisfies a predetermined criterion and for determining whether adjustment of the at least one parameter is required; and a transmitter for transmitting a signal to adjust the at least one parameter; wherein the at least one parameter of the article of footwear corresponds to at least one mechanical property of the article of footwear selected from the group consisting of absolute compression, rate of compression, frequency of compression, change in rate of compression, uneven compression, time to peak compression, time to recovery, time of flight phase, time of stance phase, stability, stiffness, resiliency, compliancy, elasticity, damping, energy storage, cushioning, and comfort." '798 patent at Claim 1.

104.     The application leading to the '798 patent underwent thorough examination. For example, the Examiner mailed multiple Office Actions rejecting the claims as anticipated under 35 U.S.C. 102 and/or obvious under 35 U.S.C. 103 in view of several prior art references. Applicants amended the claims to overcome these rejections, and on April 3, 2012, the Examiner mailed a notice of allowance confirming that the claims were allowable. Exhibit 19.  This confirms that the improvement claimed in the '798 patent was not routine, conventional, or well-known in the art as of the priority date of the '798 patent.

105.     The '439 patent describes innovative systems and methods for controlling articles of footwear. The '439 patent was filed on March 10, 2003, and does not claim priority to any earlier filed patents or applications.  None of the claims of the '439 patent is representative of the other claims.

106.     The specification of the '439 patent describes drawbacks of prior art shoes, in particular that wearers must select different shoes for different purposes.  For example, "for activities requiring greater cushioning, such as running, the wearer must select one type of shoe and for activities requiring greater stiffness for support during lateral movement, such as basketball, the wearer must select a different type of shoe." '439 patent at Col. 1:21-25. Further, the specification of the '439 patent describes that prior shoes that may be adjustable, were only manually adjustable, thus "in order to adjust such shoes the wearer is required to interrupt the specific activity in which he/she is engaged. With some shoes, the wearer may also be required to partially disassemble the shoe, re-assemble the shoe, and even exchange shoe parts."  *Id.* at Col. 1:44-48. Thus, the specification of the '439 patent describes that there is a need for a shoe that "adjusts a performance characteristic of the shoe to accommodate the biomechanical needs of the wearer." *Id.* at 2:10-12.

107. The specification of the '439 patent describes an innovative solution to this problem in an "invention relate[d] to an article of footwear including an upper coupled to a sole and an intelligent system at least partially disposed in the sole. The system includes a control system, a power source electrically coupled to the control system, an adjustable element, and a driver coupled to the adjustable element. The driver adjusts the adjustable element in response to a signal from the control system." *Id*. at Col. 2:43-50.

108. The claims of the '439 patent recite at least the following elements which, either alone or as an ordered combination, were unconventional and unique, and were not well-known, routine, or conventional: "An intelligent system for an article of footwear, the system comprising: a control system; a power source electrically coupled to the control system; an adjustable element comprising an expansion element that deforms under a load and a limiter for limiting a range of motion of the adjustable element; a driver coupled to the adjustable element for adjusting the adjustable element in response to a signal from the control system, wherein the driver positions the limiter relative to the expansion element to limit expansion of the expansion element when loaded." '439 patent at Claim 1.

109. The application leading to the '439 patent underwent thorough examination. For example, the Examiner mailed multiple Office Actions rejecting the claims as anticipated under 35 U.S.C. 102 and/or obvious under 35 U.S.C. 103 in view of several prior art references. Applicants amended the claims to overcome these rejections, and on June 21, 2006, the Examiner mailed a notice of allowance confirming that the claims were allowable. Exhibit 20. This confirms that the improvement claimed in the '439 patent was not routine, conventional, or well-known in the art as of the priority date of the '439 patent.

# GENERAL ALLEGATIONS

110.     Nike has and continues to make, use, import, sell, or offer for sale mobile systems, software, or methods for detecting, evaluating, analyzing, storing, displaying, and sharing information about the activities, movement, and performance of a user, including at least the Nike Run Club Mobile Application ("NRC App"), and Nike Training Club Mobile Application ("NTC App"), and the Nike SNKRS Mobile Application ("SNKRS App"), their respective desktop, website, and server software and interfaces.  Nike has and continues to make, use, import, sell, or offer for sale mobile systems, software, or methods for controlling functionality on its lines of shoes with lace tightening controlled by a remote device, including at least Nike Adapt, HyperAdapt, and 2016 Nike Mag as well as other shoes with EARL, Adaptive Fit, FitAdapt, or similar technology controlled by a remote device, including a device controlled via the Nike Adapt mobile application (collectively "Nike Adapt").  *See, e.g.*, https://www.nike.com/help/a/adapt-engine-components; https://www.nike.com/launch/t/hyperadapt-1-0; https://www.nike.com/adapt  Collectively, the NRC App, NTC App, SNKRS App, and Nike Adapt are the "Accused Services."

111.     The Accused Services include software for use on a mobile device with a global positioning system (GPS) receiver, and certain of the Accused Services also include software to integrate and work with third party devices such as heart rate monitors, mobile phones and the like.

112.     The Accused Services "include features that create a community for athletes, including at least: tracking and storing activity-related progress, such as location, pace, distance, elevation, heart rate, miles splits; providing athletes with personalized coaching and training tips; allowing athletes to compete and compare results with others, including on social networks;

supporting and enabling athletes having their own social networks, with tailored feeds based on personal interests; and providing athletes direct access to Nike's online digital store with highlights of products. These features drive athletes to continue to engage with their community, especially when motivation is decreased or lacking, and helps athletes stick to fitness and wellness goals." *Nike, Inc. v. Luluemon Athletica Inc., et al.*, No. 1:22-cv-00082, Dkt. 34, ¶ 10 (S.D. N.Y.).

113.    Certain of the Accused Services include software and interfaces on one or more servers that are owned, operated, placed into service, or otherwise controlled by Defendant. The Accused Services allow for input of commands and information through touchscreen interfaces on mobile devices.

114.    Certain of the Accused Services also include the capability to measure, capture, determine, store, display, transmit, and receive other information, such as athletic performance information. The Accused Services transmit data to a server.

115.    Certain of the Accused Services include or included capability to provide feedback during an athletic activity based on performance, as well as the ability to determine workout plans with different types of workouts, track performance with those plans, and modify workout plans.

116.    Defendant has had knowledge of the Patents-in-Suit and notice of its infringement since at least the filing of this lawsuit.

117.    Upon information and belief, Defendant has also been aware of its infringement of the Patents-in-Suit prior to the filing of this lawsuit.

118.    For example, in February of 2014, adidas sued Under Armour, Inc. and MapMyFitness, Inc. in the District of Delaware asserting infringement of some of the Patents-in-

Suit. *See adidas AG v. Under Armour, Inc. and MapMyFitness, Inc.*, 1:14-cv-00130-GMS (Dist. Del. February 4, 2014) ("the Under Armour Action").

119.    The Under Armour Action was widely reported in the general press and within the sporting goods industry, for example, in Bloomberg News, Reuters, The Wall Street Journal, SportTechie, Wearable Tech News, and other publications.

120.    On information and belief representatives of Defendant were aware of the Under Armour Action.

121.    The patents asserted in the Under Armour Action included the '149 patent and other patents related to the '149 patent. All of the Route Tracking Patents, including the '149 Patent include a common specification, and that specification is incorporated into the '512 Patent.

122.    The patents asserted in the Under Armour Action included patents that shared a common specification with the Fitness Tracking Patents. Upon information and belief, Defendant was aware of the Patents-in-Suit at least in part based on its knowledge of the Under Armour Action.

123.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, in March of 2017 adidas sued Asics America Corp. and FitnessKeeper, Inc. in the District of Delaware asserting infringement of some of the Patents-in-Suit. *See adidas AG v. Asics America Corp.*, C.A. No. 17-285-GMS (Dist. Del. March 17, 2017) ("the Asics Action").

124.    The Asics Action was widely reported in the general press and within the sporting goods industry, for example, in Bloomberg News, Reuters, The Wall Street Journal, SportTechie, Wearable Tech News, and other publications. In the Asics Action adidas asserted infringement

of the '149 patent, the '512 patent, and the '755 patent. Other Patents-in-Suit are related to patents asserted in the Asics Action.

125. On information and belief representatives of Defendant were aware of the Asics Action, and thus upon information and belief, Defendant was aware of the Patents-in-Suit at least in part based on its knowledge of the Asics Action.

126. As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, on information and belief, Defendant monitors adidas's patent prosecution and adidas's issued patents.

127. As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, Defendant and/or patent examiners have actually cited numerous of adidas's patents, including Patents-in-Suit and related patents, in the prosecution of Defendant's patent applications.

128. As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '149 patent is cited on at least seven (7) of Defendant's issued patents and published applications (*e.g.*, US 2016/0353502 A1; 9,529,966; 2018/0111022 A1; 10,232,220; 10,306,687; 10,310,836; 10,474,885).

129. As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '512 patent is cited on at least five (5) of Defendant's issued patents and published applications (*e.g.*, US 2010/0017402 A1; 8,858,400; 2018/0111022 A1; 10,232,220; 10,474,885).

130. As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '755 patent is cited on at least one (1) of Defendant's published applications (*e.g.*, US 2013/0106684 A1).

131.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '184 patent is cited on at least three (3) of Defendant's issued patents or published applications (*e.g.*, US 2016/0353502 A1; 10,306,687; 10,310,836).

132.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '823 patent is cited on at least one (1) of Defendant's published applications (*e.g.*, US 2013/0290080 A1).

133.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '798 patent is cited on at least fifteen (15) of Defendant's issued U.S. Patents (*e.g.*, US 9,468,261; 9,474,324; 9,867,425; 9,894,954; 10,010,129; 10,070,681; 10,117,478; 10,231,505; 10,292,451; 10,327,504; 10,477,911; 10,582,740; 10,743,620; 11,206,895; and 11,206,891).

134.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, the '439 patent is cited on at least fourteen (14) of Defendant's issued U.S. Patents or published applications (*e.g.*, US 2007/0006489A1; 2009/0272013A1; 2009/0273311A1; 2010/0331122A1; 8,616,892; 8,632,342; 2014/0165427A1; 9,044,064; 9,907,359; 9,943,139; 10,448,702; 10,477,911; 10,743,613; 11,206,891).

135.    As another example of Defendant's pre-suit knowledge of its infringement of the Patents-in-Suit, patents related to the Patents-in-Suit are cited on various of Defendant's issued patents.

136.    Nike knowingly and intentionally induces infringement of the Patents-in-Suit, as shown, for example, in the claim charts attached as Exhibits 21-29, which charts are incorporated by reference into this Complaint as if set forth fully herein. For example, a customer or end user operating the Accused Services in their default condition will directly practice at least one claim

of each of the Patents-in-Suit. *Id*. Nike induces infringement by, for example, knowing and intending that its customers and end users will commit these infringing acts. *Id*.

137.     Nike maintains a website for the NRC App. *See* https://www.nike.com/nrc-app. This website instructs customers and end uses to "scan the code to download the app." *Id*. Once the app is downloaded onto a mobile phone, the use of the NRC App on the mobile phone by an end user directly infringes at least one claim of Patents-in-Suit. The website encourages users and customers to use the infringing product by stating "Let's Run Together," and touts the NRC App as having "everything you need to start running, keep running, and enjoy running more." *Id*. The website provides further encouragement for customers and end users to use the NRC App in an infringing manner. "Need a coach to keep pace or a friend to keep you company? We're there. Want us to track your stats so you can track the scenery? No problem." *Id*.

138.     Nike maintains a website for the NTC App. *See* https://www.nike.com/ntc-app. This website instructs customers and end uses to "scan the code to download the app." *Id.* The website encourages users and customers to use the infringing product by stating "NTC's wide range of Programs will help you make progress on your own schedule and at your speed." *Id*.

139.     Nike maintains a website for the SNKRS app. *See* https://www.nike.com/snkrs-app. This website instructs customers and end users to "Explore, buy, and unlock the best of Nike sneakers. The SNKRS App provides insider access to the latest launches, hottest events, and exclusive releases that Nike has to offer." *Id*. The website further explains that the SNKRS App lets users "Stay a step ahead See what's dropping next and set notifications for the pairs you want most." *Id*. And also that the SNKRS App lets users "Get access to the most coveted drops and one-of-a-kind experiences." *Id*. It further explains that the SNKRS App lets you "Secure

your pair in SNKRS and pick it up at your nearest retailer for a seamless launch day experience." *Id.*

140. Nike maintains a website for it's the Nike Adapt line of products. *See* https://www.nike.com/adapt. The website encourages users and customers to use the infringing product explaining that customers can "[i]nstantly adjust your Nike Adapt shoes, check battery levels and more using just your smartphone. Five customizable voice commands work with Siri Shortcuts—or Google Voice, for Android users. The Nike App comes loaded with two preset fit modes: one tuned for activity and the other for relaxing. You can easily create your own with custom modes, as well." *Id.* The website provides further encouragement for customers and end users to use the Adapt App in an infringing matter. *Id.*

## COUNT I

### (Infringement of United States Patent No. 7,805,149)

141. adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

142. Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 1 of the '149 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the NRC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

143. For example, claim 1 of the '149 patent recites "A mobile phone, comprising: a global positioning system (GPS) receiver, a wireless wide-area network transmitter capable of supporting communication to a wireless communication network; a processing unit coupled to said GPS receiver and said wireless wide-area network transmitter, wherein said processing unit is capable of receiving from said GPS receiver data describing waypoints within a route of a

fitness activity, capable of determining athletic performance information associated with multiple of the waypoints, and capable of outputting at least some of the data describing the waypoints and at least some of the athletic performance to said wireless communication network via said wireless wide-area network transmitter; and a wireless wide-area network receiver, coupled to said processing unit, capable of receiving communication from said wireless communication network."

144.    The features of claim 1 are practiced in the NRC App, as shown, for example, in the claim chart attached as Exhibit 21, which chart is incorporated by reference into this Complaint as if set forth fully herein.

145.    Defendant indirectly infringes one or more claims of the '149 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App users to directly infringe at least claim 1 of the '149 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app), to explain how to use the NRC App in an infringing manner, including the use of the NRC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

146.    Defendant indirectly infringes one or more claims of the '149 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app), is especially made for use in a manner infringing one or more claims of the '149 patent as described herein and has no substantial non-infringing uses.

147.     adidas has been and continues to be injured by Defendant's infringement of the '149 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

148.     Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

149.     Defendant's infringement of the '149 patent has been willful and deliberate. Defendant has known of the '149 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT II

## (Infringement of United States Patent No. 7,957,752)

150.     adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

151.     Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 1 of the '752 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the NRC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

152.     For example, claim 1 of the '752 patent recites "A method comprising: a server receiving user input describing a route of an activity; serving a graphical representation of the route to a user device in association with a toolset including at least one of a set including an annotation tool, a rating tool, and a review tool; the server receiving route-related information including at least one of a set including a user annotation, a user rating and a user review of the

route entered utilizing said toolset; storing the route and the route-related information on the server; and the server permitting access to the route and the route-related information by a plurality of users."

153.     The features of claim 1 are practiced in by NRC App, as shown, for example, in the claim chart attached as Exhibit 22, which chart is incorporated by reference into this Complaint as if set forth fully herein.

154.     Defendant indirectly infringes one or more claims of the '752 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App users to directly infringe at least claim 1 of the '752 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app), to explain how to use the NRC App in an infringing manner, including the use of the NRC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

155.     Defendant indirectly infringes one or more claims of the '752 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app), is especially made for use in a manner infringing one or more claims of the '752 patent as described herein and has no substantial non-infringing uses.

156.     adidas has been and continues to be injured by Defendant's infringement of the '752 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's

infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

157.    Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

158.    Defendant's infringement of the '752 patent has been willful and deliberate. Defendant has known of the '752 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT III

## (Infringement of United States Patent No. 7,480,512)

159.    adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

160.    Defendant has directly infringed, literally or under the doctrine of equivalents, at least claim 21 of the '512 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the NRC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

161.    For example, claim 21 of the '512 patent recites "A program product, comprising: a tangible computer-readable storage medium encoded with program code executable by a data processing system, wherein the program code includes: a training plan module that permits selection by any of a plurality of users of a training plan from among one or more training plans in a training plan database, wherein the training plan includes a plurality of workouts each describing a prospective human physical activity to be performed and said training plan includes a distance-based performance goal for at least one of said workouts, and wherein the training

plan module, responsive to a user among said plurality of users selecting said training plan, electronically transmits data describing at least one workout in said training plan that is to be performed to a client device associated with the user, and wherein the training plan module automatically customizes at least one prospective workout of the training plan in response to one or more inputs indicating actual measured performance of the user in the human physical activity."

162.     The features of claim 21 are practiced in the NRC App, as shown, for example, in the claim chart attached as Exhibit 23, which chart is incorporated by reference into this Complaint as if set forth fully herein.

163.     Defendant has indirectly infringed one or more claims of the '512 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App users to directly infringe at least claim 21 of the '512 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app), to explain how to use the NRC App in an infringing manner, including the use of the NRC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

164.     Defendant has indirectly infringed one or more claims of the '512 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app), is especially made for use in a manner infringing one or more claims of the '512 patent as described herein and has no substantial non-infringing uses.

165.     adidas has been and continues to be injured by Defendant's infringement of the '512 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

166.     Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

167.     Defendant's infringement of the '512 patent has been willful and deliberate. Defendant has known of the '512 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT IV

## (Infringement of United States Patent No. 8,814,755)

168.     adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

169.     Defendant directly infringes, literally or under the doctrine of equivalents, at least claims 1 and 17 of the '755 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the NRC App and NTC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

170.     For example, claim 17 of the '755 patent recites "A method for a first individual using a portable performance monitoring system to engage in a physical activity competition, the method comprising: determining first performance information for the first individual using a processor during a first physical activity conducted by the first individual; receiving second

performance information associated with a second individual from a remote computing device; determining comparative performance information using the processor based on the first performance information and the second performance information: and outputting the comparative performance information."

171. The features of claim 17 are practiced in the NRC App as shown, for example, in the claim chart attached as Exhibit 24, which chart is incorporated by reference into this Complaint as if set forth fully herein.

172. For example, claim 1 of the '755 patent recites "A method for sharing information about a first individual who has engaged or is engaging in a first physical activity, the method comprising: determining first performance information for the first individual using a processor of a first portable performance monitoring system that is carried with the first individual during the first physical activity; wirelessly transmitting the first performance information from the first portable performance monitoring system; receiving the first performance information using a computing device that is not carried with the first individual during the first physical activity; and generating a visual display based on the first performance information."

173. The features of claim 1 are practiced in the NTC App as shown, for example, in the claim chart attached as Exhibit 24, which chart is incorporated by reference into this Complaint as if set forth fully herein.

174. Defendant indirectly infringes one or more claims of the '755 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App and NTC App users to directly infringe at least claims 1 and 17 of the '755 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app; https://www.nike.com/ntc-

app), to explain how to use the NRC App and NTC App in an infringing manner, including the use of the NRC App and NTC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App and NTC App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

175.     Defendant indirectly infringes one or more claims of the '755 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App and the NTC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app; https://www.nike.com/ntc-app), are especially made for use in a manner infringing one or more claims of the '755 patent as described herein and has no substantial non-infringing uses.

176.     adidas has been injured by Defendant's infringement of the '755 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

177.     Defendant's infringement of the '755 patent has been willful and deliberate. Defendant has known of the '755 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT V

## (Infringement of United States Patent No. 8,241,184)

178.     adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

179.    Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 18 of the '184 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the NRC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

180.    For example, claim 18 of the '184 patent recites "A method for providing audio feedback output to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: (a) the portable fitness monitoring device receiving a first audio feedback file and a second audio feedback file; (b) the portable fitness monitoring device generating an audio performance feedback phrase during the athletic activity by linking the first audio feedback file and the second audio feedback file by reference to an index; and (c) the portable fitness monitoring device providing the audio performance feedback phrase to the user during the athletic activity audibly through an audio output device."

181.    The features of claim 18 are practiced in the NRC App, as shown, for example, in the claim chart attached as Exhibit 25, which chart is incorporated by reference into this Complaint as if set forth fully herein.

182.    Defendant indirectly infringes one or more claims of the '184 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App users to directly infringe at least claim 18 of the '184 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app), to explain how to use the NRC App in an infringing manner, including the use of the NRC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App

in advertisements including but not limited to those on websites and other mobile app marketplace websites.

183. Defendant indirectly infringes one or more claims of the '184 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app), is especially made for use in a manner infringing one or more claims of the '184 patent as described herein and has no substantial non-infringing uses.

184. adidas has been and continues to be injured by Defendant's infringement of the '184 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

185. Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

186. Defendant's infringement of the '184 patent has been willful and deliberate. Defendant has known of the '184 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT VI

### (Infringement of United States Patent No. 9,675,842)

187. adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

188. Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 15 of the '842 patent by, without authority, making, using, importing, selling, or offering

to sell, for example, the NRC App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

189.    For example, claim 15 of the '842 patent recites "A method for providing audio feedback output to a user during an athletic activity using a portable fitness monitoring device comprising the steps of: the portable fitness monitoring device selecting an audio feedback file package from a plurality of audio feedback file packages and processing the selected audio feedback file package to provide audible output to the user through an audio output device during the athletic activity, wherein the processing comprises generating an audio feedback phrase; and the portable fitness monitoring device receiving an indication of a user input during the athletic activity, wherein the portable fitness monitoring device further provides the audible output to the user through the audio output device by processing the indication of the user input."

190.    The features of claim 15 are practiced in the NRC App, as shown, for example, in the claim chart attached as Exhibit 26, which chart is incorporated by reference into this Complaint as if set forth fully herein.

191.    Defendant indirectly infringes one or more claims of the '842 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced NRC App users to directly infringe at least claim 15 of the '842 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/nrc-app), to explain how to use the NRC App in an infringing manner, including the use of the NRC App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of NRC App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

192.     Defendant indirectly infringes one or more claims of the '842 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the NRC App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/nrc-app), is especially made for use in a manner infringing one or more claims of the '842 patent as described herein and has no substantial non-infringing uses.

193.     adidas has been and continues to be injured by Defendant's infringement of the '842 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

194.     Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

195.     Defendant's infringement of the '842 patent has been willful and deliberate. Defendant has known of the '842 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT VII

### (Infringement of United States Patent No. 10,275,823)

196.     adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

197.     Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 1 of the '823 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the SNKRS App within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

198.    For example, claim 1 of the '823 patent recites "A computer-implemented method implemented in a customer device for ensuring customer authenticity of an electronic reservation for a product from a retailer by generating reservations only if threshold authentication conditions are satisfied, the method comprising: receiving, at the customer device registered with a retailer server system, an electronic communication from the retailer server system remote from the customer device, the electronic communication providing a notification regarding launch of a product at a retail location and a time frame during which the product is available for reservation; during the time frame indicated in the electronic communication, receiving a first user input on a graphical user interface of the customer device, the first user input corresponding to a request for a reservation of the product and for selecting at least one custom feature of the product; receiving, at the customer device, a message requesting a response for authenticating a user operating the customer device; determining, at the customer device, an authenticity of the user operating the customer device, the authenticity of the user being determined based on a distance between a geographic location of the customer device and the retail location, and the determination of the authenticity of the user being performed to prevent a bot from reserving the product in advance of the launch; and transmitting, from the customer device to the retailer server system, a response to the message for authenticating the user of the customer device, the response received via a second user input, wherein the user being determined as authentic satisfies a first threshold authentication condition of one or more threshold authentication conditions, and wherein satisfaction of the one or more threshold authentication conditions causes the retailer server system to generate the reservation for the product according to the at least one custom feature selected by the first user input."

199. The features of claim 1 are practiced in the SNKRS App, as shown, for example, in the claim chart attached as Exhibit 27, which chart is incorporated by reference into this Complaint as if set forth fully herein.

200. Defendant indirectly infringes one or more claims of the '823 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced SNKRS App users to directly infringe at least claim 1 of the '823 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/snkrs-app), to explain how to use the SNKRS App in an infringing manner, including the use of the SNKRS App in manners described in the attached claim charts, which are expressly incorporated herein and (2) touting these infringing uses of SNKRS App in advertisements including but not limited to those on websites and other mobile app marketplace websites.

201. Defendant indirectly infringes one or more claims of the '823 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the SNKRS App, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/snkrs-app), is especially made for use in a manner infringing one or more claims of the '823 patent as described herein and has no substantial non-infringing uses.

202. adidas has been and continues to be injured by Defendant's infringement of the '823 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

203. Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

204. Defendant's infringement of the '823 patent has been willful and deliberate. Defendant has known of the '823 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

**COUNT VIII**

**(Infringement of United States Patent No. 8,234,798)**

205. adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

206. Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 1 of the '798 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the Nike Adapt line shoes and mobile application within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

207. For example, claim 1 of the '798 patent recites "An intelligent footwear system comprising: an article of footwear; a system for monitoring at least one parameter of the article of footwear, the monitoring system at least partially disposed in the article of footwear, wherein the monitoring system comprises: a sensor for sensing at least one value associated with the at least one parameter; and a transmitter for transmitting a signal corresponding to the sensed at least one value associated with the at least one parameter; and a device located remotely from the article of footwear and in communication with the monitoring system, the device configured to exchange data wirelessly with the monitoring system, wherein the device comprises: a processor for determining whether the sensed at least one value associated with the at least one parameter satisfies a predetermined criterion and for determining whether adjustment of the at least one

parameter is required; and a transmitter for transmitting a signal to adjust the at least one parameter; wherein the at least one parameter of the article of footwear corresponds to at least one mechanical property of the article of footwear selected from the group consisting of absolute compression, rate of compression, frequency of compression, change in rate of compression, uneven compression, time to peak compression, time to recovery, time of flight phase, time of stance phase, stability, stiffness, resiliency, compliancy, elasticity, damping, energy storage, cushioning, and comfort."

208. The features of claim 1 are practiced by Nike Adapt, as shown, for example, in the claim chart attached as Exhibit 28, which chart is incorporated by reference into this Complaint as if set forth fully herein.

209. Defendant indirectly infringes one or more claims of the '798 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced Nike Adapt users to directly infringe at least claim 1 of the '798 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/adapt), to explain how to use Nike Adapt in an infringing manner, including the use of the Nike Adapt in manner described in the attached claim chart, which are expressly incorporated herein and (2) touting these infringing uses of Nike Adapt in advertisements including but not limited to those on websites and other mobile app marketplace websites.

210. Defendant indirectly infringes one or more claims of the '798 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the Nike Adapt, which, as evidenced by Defendant's website (*see, e.g.*,

https://www.nike.com/adapt), is especially made for use in a manner infringing one or more claims of the '798 patent as described herein and has no substantial non-infringing uses.

211.    adidas has been and continues to be injured by Defendant's infringement of the '798 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

212.    Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

213.    Defendant's infringement of the '798 patent has been willful and deliberate. Defendant has known of the '798 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT IX

## (Infringement of United States Patent No. 7,188,439)

214.    adidas realleges and incorporates herein by reference the allegations set forth in the foregoing paragraphs of this Complaint.

215.    Defendant directly infringes, literally or under the doctrine of equivalents, at least claim 1 of the '439 patent by, without authority, making, using, importing, selling, or offering to sell, for example, the Nike Adapt line of shoes and mobile application within the United States, in violation of 35 U.S.C. § 271, and by inducing and contributing to the infringement by third parties of the same.

216.    For example, claim 1 of the '439 patent recites "An intelligent system for an article of footwear, the system comprising: a control system; a power source electrically coupled

to the control system; an adjustable element comprising an expansion element that deforms under a load and a limiter for limiting a range of motion of the adjustable element; a driver coupled to the adjustable element for adjusting the adjustable element in response to a signal from the control system, wherein the driver positions the limiter relative to the expansion element to limit expansion of the expansion element when loaded."

217.    The features of claim 1 are practiced by Nike Adapt, as shown, for example, in the claim chart attached as Exhibit 29, which chart is incorporated by reference into this Complaint as if set forth fully herein.

218.    Defendant indirectly infringes one or more claims of the '439 patent within the United States by inducement under 35 U.S.C. § 271(b). For example, Defendant has knowingly and intentionally induced Nike Adapt users to directly infringe at least claim 1 of the '439 patent, inter alia, by (1) providing instructions or information, for example on publicly available websites (*see, e.g.*, https://www.nike.com/adapt), to explain how to use Nike Adapt in an infringing manner, including the use of the Nike Adapt in manner described in the attached claim chart, which are expressly incorporated herein and (2) touting these infringing uses of Nike Adapt in advertisements including but not limited to those on websites and other mobile app marketplace websites.

219.    Defendant indirectly infringes one or more claims of the '439 patent by contributing to the direct infringement of end users under 35 U.S.C. § 271(c) by providing the Nike Adapt, which, as evidenced by Defendant's website (*see, e.g.*, https://www.nike.com/adapt), is especially made for use in a manner infringing one or more claims of the '439 patent as described herein and has no substantial non-infringing uses.

220.     adidas has been and continues to be injured by Defendant's infringement of the '439 patent. adidas is entitled to recover damages adequate to compensate it for Defendant's infringing activities in an amount to be determined at trial but in no event less than a reasonable royalty.

221.     Unless enjoined by this Court, Defendant's acts of infringement will continue to damage adidas irreparably.

222.     Defendant's infringement of the '439 patent has been willful and deliberate. Defendant has known of the '439 patent and its infringement thereof and continued its unlawful actions nevertheless. adidas is therefore entitled to increased damages under 35 U.S.C. § 284 and attorneys' fees and costs under 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, adidas respectfully prays that this Court:

a.   Enter a judgment that Defendant has infringed one or more of the Patents-in-Suit.

b.   Grant a permanent injunction restraining and enjoining Defendant and its officers, directors, agents, servants, employees, successors, assigns, parents, subsidiaries, affiliated or related companies, and attorneys from directly or indirectly infringing one or more of the Patents-in-Suit;

c.   Award adidas damages in an amount sufficient to compensate adidas for Defendant's infringement of the Patents-in-Suit, but not less than a reasonable royalty, together with interests and costs;

d.   Enter a declaration that the case is exceptional and correspondingly award adidas attorney fees and costs under 35 U.S.C. § 285;

e. Find that Nike's infringement of the Patents-in-Suit has been willful and award enhanced damages and prejudgment interest to adidas under 35 U.S.C. § 284;

f. Grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

adidas hereby demands a jury trial on all issues appropriately triable by a jury.

Dated : June 10, 2022      By: */s/ Melissa R. Smith*
MELISSA R. SMITH
(Texas State Bar No. 24001351)
HARRY L. GILLAM, JR.
(Texas State Bar No. 07921800)
303 South Washington Avenue
Marshall, Texas 75670
Telephone: (903) 934-8450
Facsimile: (903) 934-9257
Email: melissa@gillamsmithlaw.com
Email: gil@gillamsmithlaw.com

Of Counsel:      MITCHELL G. STOCKWELL (GA Bar No. 682912)
MICHAEL T. MORLOCK (GA Bar No. 647460)
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: mstockwell@kilpatricktownsend.com
Email: mmorlock@kilpatricktownsend.com

MATIAS FERRARIO (NC Bar 38723)
ANDREA A. ANDERSON (*pro hac vice pending*)
1001 West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 607-7300
Email: mferrario@kilpatricktownsend.com
Email: andie.anderson@kilpatricktownsend.com

EDWARD J. MAYLE (*pro hac vice pending*)
1400 Wewatta Street, Suite 600
Denver, CO 80202

Telephone: (303) 571-4000
Email: tmayle@kilpatricktownsend.com

CHRISTOPHER P. DAMITIO (*pro hac vice pending*)
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Telephone: (206) 467-9600
Email: cdamitio@kilpatricktownsend.com

*Attorneys for Plaintiffs*
*adidas AG, adidas International Marketing B.V.,*
*adidas America, Inc., and runtastic GmbH*